ROBERT H. SMITH *v.* WILLIAM SMITH and others.

Where a person, being *in extremis,* and conscious of it,—sent for a friend with whom he had often talked on ,the subject of a will,— and told him what disposition he wanted to make of his property, and then such friend replied that if he wanted to do anything of that kind he had better have some other person in the room, and thereupon the speaker went out and brought in another person, .and in the presence of the sick man repeated the proposed disposition of the property, to which the latter assented; *Held* to be a sufficient *rogatio testium* to satisfy the requirements of a nuncupative will.

(*Harden* v. *Bradshaw*, 1 Win. 263, cited and approved.)

CAVEAT of a nuncupative will, tried before *Cloud, J.,* at ROWAN, Spring Term 1869.

Upon the trial the jury found the following special verdict:

"That Charles D. Smith, the alleged testator, died on the 8th day of October, 1867—that shortly before his death he had talked with one John J. Shaver about his property—that on the day the last conversation took place, to wit, on the 6th day of October 1867, he sent for said Shaver, and after Shaver got to his room there was a negro boy in the room, whom the said C. D. Smith directed to leave the room. The said C. D. Smith then remarked to said Shaver that he wanted to make some disposition of his property—that Shaver told him if he wanted to do anything of the kind he had better have some other person in the room—that thereupon the said Shaver went down and told Theodore Klutts to come up— that before Shaver went down for Klutts, the said C. D. Smith said 'to Shaver he wanted a tomb-stone over his father, mother, wife and two children, and himself, and the balance of his property of every description he wanted to go to his brother, Robert H. Smith, who is the propounder—that when Shaver returned he remarked to the said C. D. Smith, "here is Theodore Klutts"—that Shaver also told him he could now go over what he wanted done—then Shaver went over in the presence of the said C. D. Smith and Klutts what the said C. D. Smith had before told as to the disposition he desired made

of his property—nothing more was said or done; they further find that when Theodore Klutts got into the room, Shaver told him, Klutts, in the presence and hearing of said C. D Smith, what disposition he wanted made of his property—that the next thing that occurred was, that Shaver stated that said C. D. Smith wanted tomb-stones put over his father, mother, wife and two children, and the balance of property to go to his brother Robert—that said C. D. Smith interrupted Shaver and said, "and over myself, also"—that Shaver went back and repeated it all over to said C. D. Smith—that when he, Shaver, got through, he remarked, "is that right, or is that all?" he, said C. D. Smith, nodded his head, or said, yes—that said Klutts then went down stairs. The jury further find that all this occurred in the last sickness, at his usual place of residence, and the said C. D. Smith was then of sound and disposing mind and memory—that the alleged testamentary words were reduced to writing before 8th October, 1867, as follows:

STATE OF NORTH CAROLINA, }
ROWAN COUNTY. }

We, the undersigned, being called on to witness what disposition Charles D. Smith wanted made of his property in case of his death: "First, he wanted tombstones put over his father, mother, wife and two children, and himself, and the balance of estate of every description to go to his brother, Robert H. Smith." August 6, 1867.

JNO. J. SHAVER,
THEO. KLUTTS.

That during the time Shaver and Klutts were present together, the said C. D. Smith said but one word or made but one gesture, except about reminding Shaver of putting tombstone over himself—that the said C. D. Smith had some time before spoken to one Caldwell an attorney, to draw a will making some disposition of his property, which was not done —that some days after the time that Shaver and Klutts were together as aforesaid, the said C. D. Smith stated to a Mrs.

Utzeman that he had made his will, and willed all of his property to his brother Robert. That said Smith had been residing at the place over ten days, and that the estate in controversy is worth over two hundred dollars. But the jury being ignorant of the law, say that if the foregoing facts amount in law to a nuncupative will, they so find; and if not they so find."

His Honor being of opinion that the foregoing facts did not constitute a nuncupative will, gave judgment for the caveators, and the propounder appealed.

*Kerr Craige*, for the appellants.

*Boyden & Bailey, contra.*

DICK, J. The statutory provisions (Rev. Code, ch. 119, sec. 11) in relation to nuncupative wills, have existed in this State since 1784, and they are substantially the same as those in the statute of frauds, 29 Car. 2, ch. 3, sec. 19, 20; and these provisions have always been strictly construed and enforced by the Courts, both in this State and in England.

Previous to the enactment of the Statute of frauds, nuncupative wills of personal estate were admitted to probate by the English Ecclesiastical Courts, when it was shown that the testator at the time of nuncupation was *in extremis*, and unable to have a written will prepared, and the present strict formalities were not required. The same liberality as to such wills may now be shown in this State, where the estate bequeathed does not exceed the sum of two hundred dollars in value.

The provisions of the Statue of frauds in regard to nuncupative wills were enacted to prevent "fraudulent practices," &c., and since that time it has generally been held by the Court that all the requirements of the statute must be strictly complied with, before such wills can be admitted to probate. In the case before us the testamentary capacity, the *animus testandi* at the time of the alleged nuncupation, and all the other requisites of the statute, except the *rogatio testium*, are established by the special verdict. There is not the slightest

suspicion raised by the testimony, of any "fraudulent practice," and we think the facts found in the special verdict show a sufficient *rogatio testium.* The testator was conscious of his condition, and was very anxious to make a disposition of his property. Some time before his nuncupation, he had applied to a lawyer to prepare a written will, which had not been done, and he had frequently talked with witness Shaver on the subject. When he was almost *in extremis*, he sent for the witness Shaver, and told him (Shaver) what disposition he wished to be made of his property, and assented to another witness being sent for. In our opinion this was a sufficient *rogatio testium* as to witness Shaver, and meets the require- ment of the statute in this respect, *Harden* v. *Bradshaw*, 1 Win. 263. The testamentary words were afterwards repeated twice in the presence of two witnesses, and were fully understood and assented to by the tesiator. The facts in this case in relation to the *rogatio testium* are certainly as strong and conclusive as those in the case of *Harden* v. *Bradshaw.*

The judgment in the Court below must be reversed, and judgment rendered in this Court upon the special verdict. This will be certified to the Court below, to the end that a *pro- cedendo* may issue to the Probate Judge, &c.

PER CURIAM.                              Judgment reversed.